June 12, 1991

IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

IN THE MATTER OF THE )
 ADOPTION OF NOEL TUDELA )
 OLOPAI AND GIOVANNI TARS )
 TUDELA OLOPAI, )
 )
 Minor Children. )
_____)

APPEAL NO. 90-021
CIVIL ACTION NO. 88-72A

OPINION

Argued October 5, 1990

Counsel for Appellant: Michael A. White
 P. O. Box 222, CHRB
 Saipan, MP 96950

BEFORE: DELA CRUZ, Chief Justice, BORJA, Justice, and KOSACK,
 Special Judge.

BORJA, Justice:

## FACTS

This is an appeal from a decree granting a petition for adoption. Juan T. Taitano, Jr. (hereafter Taitano)[1] filed the petition November 3, 1988. Taitano sought to adopt Noel Tudela Olopai and Giovanni Tars Tudela Olopai, the minor children of Primitiva T. Taitano, Jr. (hereafter Primitiva), the wife of Taitano. The natural father of the children is Tarsicio K. Olopai (hereafter Olopai). Primitiva previously lived with Olopai for

---

[1] We note that Taitano is not represented in this appeal. Several days before oral argument, this Court learned that counsel for Taitano in the adoption proceeding was not counsel on appeal.

93

approximately three years.

A notice of hearing was issued on November 3, 1988. Another notice of hearing was issued on November 9. The petition was set for hearing on November 17.

Olopai did not see a copy of the Notice of Hearing until the morning of the 17th.[2] The petition itself was never served on Olopai.

Olopai moved for a continuance on the 17th. The court granted the continuance until the 22nd, at 1:30 p.m. One of the matters considered by the Court was that Taitano was stationed at an Army Base in Germany. He was scheduled to depart Saipan with his wife and the two minor children on November 23, 1988.

On November 22, 1988, Olopai again moved for a continuance to have more time to prepare his objection to the petition. The motion was denied. The petition was heard on the 22nd, and the decree issued the next day granting the adoption.

Olopai and Primitiva were never married but lived together since the latter part of 1984 until September 1987. They lived together at the home of Olopai's uncle. While living together, they had two children, Noel Tudela Olopai (born February 14, 1985) and Giovanni Tars Tudela Olopai (born March 25, 1987). These two children were the subject of the adoption proceeding.

Olopai and Primitiva separated in September 1987. Primitiva

_____

[2]Counsel for Olopai, prior to the hearing on the 17th, represented to the court that his client saw the notice the day before. During the examination of Olopai, however, he testified that he saw it the day of the hearing.

moved out of the home they were staying in and took the two children with her.

Olopai unsuccessfully tried to visit the children where they were staying. He did manage to have the children visit him once at his residence. He further managed to visit each of the children once when they were hospitalized at different times.

Olopai never provided financial support to the boys since they were separated from him. When the boys were hospitalized, Olopai brought them toys and pajamas.

On January 6, 1988, Primitiva and Taitano were married and Taitano started supporting the children.

Based on the above facts, the trial court granted the petition for adoption and concluded that:

> 1. Although Olopai had not consented to the adoption of the children, he was given notice and he did appear and was represented at the proceeding by an attorney.
>
> 2. The interests of the children would be promoted if they are adopted by the petitioner.
>
> 3. Olopai abandoned the children for more than six months.

Olopai, in this appeal, argues that the trial court erred in denying his motion for a continuance, and in concluding that an abandonment had occurred.

## STANDARD OF REVIEW

The denial of a motion for continuance is subject to the abuse of discretion standard. Commonwealth v. Bordallo, No. 90-003, slip

95

op. at 10 (N.M.I. June 8, 1990).

Whether an abandonment had occurred is a legal conclusion subject to de novo review. Loren v. E'Saipan Motors, Inc., No. 89-006, slip op. at 3 (N.M.I. April 16, 1990).

ANALYSIS

I. Denial of Motion for Continuance

In Commonwealth v. Bordallo, supra, we adopted the four factors to be considered, as stated in U.S. v. 2.61 Acres of Land More Or Less, 791 F.2d 666, 671 (9th Cir. 1985), in reviewing a denial of a motion for continuance. They are:

1. Movant's diligence in his efforts to ready his defense prior to the date set for hearing;

2. The likelihood that the need for a continuance could have been met if the continuance had been granted;

3. The extent a continuance would have inconvenienced the court and opposing party; and

4. The extent the movant might have suffered harm as a result of the denial.

No one factor is dispositive. We weigh each one to determine whether the denial was arbitrary or unreasonable. However, if appellant cannot show prejudice by the denial, we will not reverse the trial court's ruling.

In considering the four factors, we hold that the trial court abused its discretion in denying the request for a continuance. Three of the four factors weigh heavily in favor of Olopai.

96

We cannot say that Olopai was not diligent when he was not even given time to file a response to the petition, much less prepare a defense.

Olopai wanted more time to adequately prepare for the hearing. However, he should have been given more time to file a response first. Thereafter, the time for the hearing could have been scheduled.

The record does not show that the court would have been inconvenienced had a continuance been granted. While Taitano would have been inconvenienced due to his scheduled departure from the Commonwealth, his inconvenience is minimal compared to the prejudice suffered by Olopai by the denial of the continuance.

The denial of the continuance severely prejudiced Olopai. His natural parental rights to his children were at stake. Yet, he was not only denied adequate time to prepare his defense, he was also denied adequate time to file a response. His right to procedural due process was violated because he was not given a meaningful opportunity to be heard. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

The NMI does not have a specific statute dealing generally with proceedings to terminate parental rights. The closest statute is the Uniform Parentage Act, 8 CMC §§ 1700-1726 (hereafter sometimes referred to as the Act). This Act has provisions for the termination of parental rights in the event that the natural mother wishes to relinquish a child for adoption and the natural father cannot be identified (section 1725(d)); or if the natural father

97

has been identified but does not appear at a hearing, after due notice; or, if he appears, fails to claim custodial rights (section 1725(c)). The Act does not provide for situations where the natural mother does not wish to relinquish her child for adoption, as in this case.

In the absence of a specific statute, the procedure under the Act, including the notice provisions, for the termination of parental rights should be applied to situations like the case before us. Such procedure provides the minimum procedural due process safeguards. We hold that the procedures and notice provisions under the Act should be followed in cases where the natural mother, or father, does not wish to relinquish a child for adoption, but merely wishes to consent to the adoption of her or his child by her or his spouse.

The Act sets up certain procedures to be followed in a certain adoption proceeding governed by it. Applying such procedures to the present case, the following analysis would ensue.

Olopai is a presumed father under Section 1704(a) of the Act. This section gives five situations where a man is presumed to be the natural father of a child. Subsection (4) states that a man is presumed to be the father of the child if

> while the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child. . . .

The facts are uncontradicted that Olopai received the minor child, Noel, into his home since the date he was born on February 14, 1985, until September 1987. Olopai received the minor child,

98

Giovanni, into his home since the date he was born, March 25, 1987, until September 1987. It is also uncontradicted that both minors' birth certificates list Olopai as the father, and have Olopai's signature, in addition to Primitiva's, as being the informant. Olopai openly held himself out as the father of the children.

■Since Olopai is the natural father of the children, the children's adoption cannot proceed unless and until the parental rights of Olopai have been terminated.

Section 1725(a), in pertinent part, requires that:

> [I]f a child otherwise becomes a subject of an adoption proceeding, the . . . mother or the person having custody of the child, shall file a petition in the Commonwealth [Superior Court] to terminate the parental rights of the father, unless the father's relationship to the child has been previously terminated or determined by a court not to exist.

Olopai's relationship to the children had not been previously terminated or determined by a court not to exist. The trial court should hold the adoption proceeding in abeyance while Primitiva files a petition to terminate the parental rights of Olopai.

■Section 1725(e) requires notice to Olopai of the proceeding to terminate parental rights. This section requires that such notice be given to Olopai "in the manner appropriate under the rules of civil procedure for the service of process in a civil action in this Commonwealth or in any manner the court directs."

When the petition to terminate parental rights is filed, Olopai will be served pursuant to section 1725(e) of the Act. Under Com.R.Civ.P. 12, he would then have twenty days to file an answer. The hearing on the petition could then be set for sometime

thereafter.

This is not to say that there can never be a time when a hearing will be scheduled for an earlier time. There may be situations where it might be justifiable. But such a decision should be made only after a party has made an appropriate motion and the matter is heard after due notice.

## II. Abandonment

██We agree with Olopai that the parent and child relationship is fundamental and natural. Such a relationship is highly esteemed in our Commonwealth. See the Commonwealth Family Protection Act of 1986, 8 CMC §§ 1221-1233. 8 CMC § 1221(b) acknowledges that there exists "customary strong family relationships" in the Northern Mariana Islands. The term "family relationships" includes the parent and child relationship. 8 CMC § 1222(g).

Because the parent-child relationship is natural and fundamental, it follows that termination of such a relationship should require proof beyond a preponderance of the evidence. We agree with the holding and reasoning of the majority in Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) that clear and convincing evidence should be required.

We hold that the burden of proof necessary in a proceeding to terminate parental rights is clear and convincing evidence.

██We agree with Olopai that the trial court's conclusion of abandonment is not supported by clear and convincing evidence. The record is undisputed that Olopai resided with the children from the

100

date of their births to September 1987. After their separation, he attempted to visit the children once. Because of the manner and time that he made the attempt, he was advised by the police that he was to stay away from the residence where his children were staying. He complied. However, he made several attempts to have the children brought to him. He succeeded only once. He succeeded in having the children brought to him just five months before the hearing on the adoption proceeding. He visited the children on two different occasions when they were hospitalized separately. The record shows that he attempted to have the children brought to him one month before the hearing on the adoption proceeding. His attempts were unsuccessful due to the refusal of Primitiva and/or Taitano to have the children taken to him. These undisputed facts do not establish clearly and convincingly that Olopai abandoned the children.

Although we declare the parent-child relationship to be fundamental and natural, such a relationship could be terminated when circumstances, not necessarily on the basis of abandonment, warrant it. We address the criteria to consider in terminating one's parental rights because of our decision to remand this case to the trial court for further proceedings.

The Commonwealth does not have any specific statute setting forth the criteria to be considered in a proceeding to terminate parental rights. However, in situations such as the present case, where the termination proceeding arises as a result of an adoption proceeding, i.e., the adoption proceeding cannot proceed unless and

until the parental rights of the father has been terminated, we look to our adoption statute to see if the criteria can be determined.[3]

Our adoption statute states that an "adoption shall be granted only if the Court is satisfied that the interests of the child will be promoted by the adoption." 8 CMC § 1403.

Olopai argues that this provision does not preclude consideration of the fitness of the parent, the neglect of the child, etc. As such, he contends that we should hold that in a proceeding to terminate parental rights, the criterion is consideration of not only the best interest of the child, but also the natural and fundamental right of the parent to the child.

 We find that there is no reason why we cannot, or should not, extend the best interest of the child criteria in an adoption proceeding to a termination of parental rights proceeding. In either proceeding, it is the interests of the child that should be paramount. We hold that the best interest of the child is the paramount criteria to consider in a proceeding to terminate the

---

[3]We do not address the criteria to be used in a parental rights termination proceeding not resulting from an adoption proceeding.

The dissent contends that our decision to apply the best interest of the child criteria to a parental rights termination proceeding is tantamount to judicial legislation. Dissent at 25. We disagree. We point out that this is a case where the need for a termination proceeding is the result of the filing of an adoption proceeding. We are filling in certain gaps in the Uniform Parentage Act to make it meaningful and workable in this situation. This is, statutory interpretation. Absent specific statutory factors to be considered in this type of parental rights termination proceeding, we are duty-bound to do so.

parental rights of a parent or parents.[4]

The term "best interest of the child," requires, at the very least, consideration of the fundamental relationship existing between the child and the natural parent(s). The interests of the

<hr>

[4]The dissent contends that this criteria violates due process. It maintains that "[d]ue process requires that the father's rights cannot be terminated without a finding of unfitness." Dissent at 24.

We cannot accept the dissent's position that a parent should have a veto power over the welfare of a child. The "best interests of the child" criteria provides a sufficient constitutional safeguard.

In constitutional analysis, a weighing of competing interests is often necessary. In this particular case, we need to balance three interests--the rights of the parent in a parent-child relationship, the rights of the minor children in such a relationship, and society's interest in maintaining harmony in, and fostering, such a relationship.

The dissent suggests that the criteria of "best interests of the child" and "unfit parent" are mutually exclusive. Such is not true. We recognize both the child's and the parent's interests as being natural and fundamental. The criteria "best interests of the child" requires consideration of the fitness or unfitness of a parent. The ultimate decision, however, as to which interest, when they compete, is paramount, is the child's interest. This does not violate due process.

A review of Commonwealth statutes dealing with children show that the "best interests of the child" criteria is the only criteria used. Our adoption statute allows an adoption only "in the interests of the child." 8 CMC § 1403. The Uniform Child Custody Jurisdiction Act, 8 CMC §§ 1601 et seq., states that one of its purposes is to ensure that a custody decree is rendered in the state that can best decide the case "in the interest of the child." 8 CMC § 1602(a)(2). In section 1604(a)(2) of the same statute, the trial court is given jurisdiction to make a child custody determination if it is "in the best interest of the child." Under the same criteria, the trial court can also determine that another state assume jurisdiction. 8 CMC § 1608(c). In section 1609(b) of the statute, the court is allowed to decline jurisdiction by reason of conduct, unless required "in the interest of the child." The dissent correctly notes at page 23 that the purpose of the Uniform Parentage Act is to establish paternity. 8 CMC §§ 1700 et seq. Yet in section 1713(a), it is stated that the judge or referee must evaluate whether a judicial declaration of the father and child relationship would be "in the best interest of the child." See also 8 CMC § 1715(c).

103

adopting parent(s), although not fundamental unless and until the adoption is granted, should also be considered. Such consideration shall include, but not be limited to, the age of the child; the extent of the bond, or potential bond, between each natural parent to the child; the fitness or unfitness of either or both natural parents, taking into account whether the child has been abandoned, neglected, subjected to cruelty, both mental and/or physical, whether either parent is a habitual user of alcohol or drugs, whether either parent has been convicted of a felony where the nature of the crime is inconsistent with being a fit parent, etc.; the extent of the bond, or potential bond, between the adoptive parent(s) and the child; the ability of the natural parent(s) to provide adequate and proper love, care, attention, and guidance to the child; and the ability of the adoptive parent(s) to provide adequate and proper love, care, attention, and guidance to the child. The term "best interest of the child" is sufficiently broad to include all the foregoing considerations.

## CONCLUSION

The decision of the trial court is **VACATED**, and the matter is remanded with instructions that:

1. the adoption proceeding be held in abeyance until a petition to terminate the parental rights of Olopai is filed by Primitiva and disposed of, applying the burden of proof and the criteria set forth in this Opinion;

2. the issue of whether Tarsicio K. Olopai has abandoned his

children shall not be re-litigated in the petition to terminate his parental rights since we have determined that an abandonment has not occurred; and

3. if a petition to terminate the parental rights of Olopai is not filed by Primitiva, the trial court shall dismiss the adoption proceeding.

Jose S. Dela Cruz
Chief Justice

Jesus C. Borja
Associate Justice

KOSACK, Special Judge, Dissenting:

I respectfully dissent. I disagree that the criteria for the termination of parental rights is the best interest of the child. I believe that the majority misconstrued the adoption statute and that the criteria used violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.[1] I do agree, however, that the Commonwealth lacks a specific statute for the termination of parental rights. Perhaps the writing of a dissent will underscore the need for legislation.

## I.

### ADOPTION CALLS FOR TERMINATION OF PARENTAL RIGHTS.

This case calls for the court to terminate the parental rights of Tarsicio K. Olopai, the natural father of Noel Tudela Olopai and Giovanni Tars Tudela Olopai. If Juan T. Taitano, Jr. is permitted by the court to adopt the children, then two things will result: (1) the parental rights of Tarsicio Olopai will be terminated, and (2) Juan Taitano will succeed to those rights. According to 8 CMC § 1404(b), the granting of an adoption will terminate the rights of the natural parents to their child:

> The natural parents of the adopted child are, from the time of adoption, relieved of all parental duties toward the child and all responsibilities for the child so adopted, and have no right over it. (Emphasis added.)

---

[1] The Fourteenth Amendment is applicable in the Commonwealth pursuant to Section 501 of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, reprinted in CMC, Vol. 1 at B-101 and in 48 U.S.C.A. § 1681 note (West 1987).

Section 1404(a) transfers the parental rights to the adopting parent:

> After a decree of adoption has become absolute, the <u>adopted child and the adopting parents shall hold towards each other the legal relation of parent and child and have all the rights</u> and be subject to all the duties of that relationship. (Emphasis added.)

In other words, the effect of an adoption is the severance of the rights and duties of the natural parent towards the child and the transfer of those rights and duties to the adoptive parent.

Termination of parental rights should be distinguished from a loss of custody. Despite a loss of custody, a parent still has the right to visit his or her child, obtain custody in the future, inherit from the child, and make certain significant decisions concerning the child's future. In contrast, a loss of parental rights is a loss of all claim to one's child.

In this case, where the natural father does not wish to lose his parental rights over his sons, a very important issue is raised: when is a court justified in permanently severing the parent-child relationship?

## II.

### THE MAJORITY TERMINATES PARENTAL RIGHTS WHEN IT IS IN THE BEST INTERESTS OF THE CHILD.

The majority recognizes that Olopai is presumed to be the children's father and that the children cannot be adopted by Tudela until Olopai's parental rights have been terminated. It correctly

holds that the parent-child relationship is "natural and fundamental," so that clear and convincing evidence is required to terminate such a relationship.

In the absence of a statute terminating parental rights, the majority consults the adoption statute, 8 CMC § 1403. Because adoptions may be granted "only if the Court is satisfied that the interests of the child will be promoted by the adoption," Id., the majority "extend[s] the best interest of the child criteria in an adoption proceeding to a termination of parental rights proceeding." Therefore, in the absence of a specific statute authorizing the termination of parental rights, the majority establishes its own criteria borrowed from the adoption statute.

I believe that the "best interests of the child" criteria is not sufficient to terminate a parent's fundamental constitutional right to maintain a parent-child relationship.

### III.

#### A PARENT-CHILD RELATIONSHIP CAN BE TERMINATED ONLY UPON PROOF THAT A PARENT IS UNFIT.

A. Due Process Right.

The United States Supreme Court has recognized a fundamental liberty interest inherent in parents to maintain their parent-child relationships. "We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected." Quilloin v. Walcott, 433 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (citations omitted).

108

At the foundation of the Due Process Clause of the Fourteenth Amendment is whether a person has an interest that falls within the definition of "liberty" or "property". Smith v. Organization of Foster Families, 431 U.S. 816, 838-839, 97 S.Ct. 2094, 2106, 53 L.Ed.2d 14 (1977). In Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the Court unanimously ruled that it was "not disputed that state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." 452 U.S. at 37, 101 S.Ct. at 2156. This is because freedom of personal choice in matters of family life is a fundamental liberty interest. Santosky v. Kramer, 455 U.S. 751, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

The degree to which the parent-child relationship is protected by the Due Process Clause depends upon the extent to which a bond has formed between the parent and child. The bond that forms from carrying a child in pregnancy and giving birth to a child is sufficient to give rise to due process protection of the parent-child relationship for mothers, regardless of their subsequent role in the child's rearing. For fathers, however, parental rights do not exist merely by virtue of their biological relation to the child. If the father and mother were unmarried at the child's birth, the court will recognize the unwed father's rights only if he has carried out parental duties for some period of time in the rearing of the child. When such rights are determined to exist in either the mother or father of the child, then the parent-child

relationship can be terminated only upon a finding that the parent is unfit.

In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed. 2d 551 (1972), the Court recognized a father's due process rights even though his three children were born out of wedlock, he had lived only "intermittently" with them and the mother over an 18 year period, and when the mother died he put the children in the care of a third person. The state sought to terminate his parental rights under a statute presuming an unwed father to be unfit. Although the father did not desire to have custody of the children, he fought to maintain his status as their father in the dependency proceedings. The Stanley court ruled the statute violated due process and that the father's parental rights could not be terminated without a showing that he was unfit. In recognizing the father's rights, the Court noted that he had acknowledged the children as his children and had lived with them for some period.

Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 841, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) involves foster families; however, it serves to illustrate that the essential ingredient in these cases is not the biological relationship but the type of bond formed between parent and child. The majority suggested that it was possible to find a parent-child relationship in foster families because the importance of the familial relationship "stems from the emotional attachments that derive from the intimacy of daily association . . . as well as from the fact of blood relationship." 431 U.S. at 844, 97 S.Ct. at

110

2109. A concurring opinion agreed that a parent-child relationship could be formed without a blood relationship, but argued that the temporary nature of foster relationships does not provide for a sufficient bond.

In Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed. 2d 511 (1978), despite the existence of a blood relationship, the court did not find a constitutionally protected parent-child relationship. Procedurally, the case is very similar to the case before this Court. A child was born out of wedlock. The mother subsequently marries another man who thereby becomes the child's stepfather. Eventually, the mother consented to the stepfather's adoption of the child. The natural father, who will be displaced by the adoption, objects. In Georgia, the natural father has veto authority over the adoption of his child unless he is adjudicated to be an unfit father. But, if the natural father has not married the mother and acknowledged the child as his own or obtained a court order legitimating the child, he would have no right to be heard in the adoption proceeding. The court's determination would be based on the "best interests of the child" under the statute. The Quilloin court concluded that the Georgia statute, as applied to the facts of this case, did not violate the father's due process rights.

Quilloin turns very tightly upon its facts. Not only did the natural father never marry the mother, but he never lived with the mother or the children. Instead, the child in the proceeding, then eleven and one-half years old, had been raised in the home of his

mother and stepfather since the age of three. He also expressed a desire to be adopted by the stepfather.

The unanimous court observed:

> We have little doubt that the Due Process Clause would be offended "if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason, that to do so was thought to be in the children's best interests." Smith v. Organization of Foster Families [citation omitted]. . . .

(Emphasis added.) Id., 434 U.S. at 256, 98 S.Ct. at 555, 54 L.Ed.2d at 520. The father had never had, or sought, legal custody. In effect, granting an adoption resulted in the recognition of the family unit that had been in existence for many years. Essentially, the court's decision was based upon the strong bond that had already formed between the boy and his stepfather and the lack of such a bond between him and his the natural father.

The Quilloin father did provide occasional support, had visited with the child on many occasions and had from time to time given him toys and gifts. However, the prime factor in the court's decision was the fact that he had never had custody over the child:

> [He] had never exercised actual or legal custody over his child, and thus [had] never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child . . . .

(Emphasis added.) Id., 434 U.S. at 256, 98 S.Ct. at 555. The importance of being responsible as a parent for the daily supervision, education, protection, and care of a child is the common thread through all three decisions. In Stanley, the fact

112

that the father had lived "intermittently" with the children influenced the court to recognize his rights, even though he did not seek custody of the children after their mother died. In Smith, the court had no difficulty in recognizing parental rights in persons not related by blood to a child, if they had exercised daily supervision, education, protection, and care. In Quilloin, the significant factor that caused the court to not recognize the father's rights was the fact that he had never exercised daily care and control over the child (while someone else had in his place).

The first step in an adoption proceeding which is opposed by the unwed natural father is to determine whether he possesses any parental rights. Such a decision must be made against the background of these cases. If he does possess parental rights, then his parent-child relationship can be terminated only upon a showing that he is unfit. If he does not possess parental rights, then there is no need for a due process termination hearing.

## B. Olopai Possesses Parental Rights.

Applying the factual findings of the majority, Olopai has sufficient contacts with the children to give rise to a constitutionally protected liberty interest. This interest cannot be terminated simply upon a finding that it is in the best interests of the child. Under the Fourteenth Amendment, a court must find that he is unfit as a father.

Olopai and Primitiva have never married. However, at the birth of each son, Olopai did sign his name to the child's birth

113

certificate acknowledging that he was the father. He openly held himself out as the father of both children. When the boys were born, Olopai lived with their mother. He and Primitiva had created a home together for nearly three years at his uncle's house. He received both boys into that home. Noel lived with him continuously for two and one-half of his three and three-quarters years. Giovanni lived with him continuously for one-half year of his one and one-half years.[2]

The facts in this case are quite distinguishable from Quilloin. Olopai appears to have had legal and actual custody of the boys during the periods they lived with him. At that time, he would have exercised responsibility as to their daily supervision, care, and protection. This is the key ingredient in the formation of the parent-child relationship. On the other hand, there has been insufficient opportunity for any other person to occupy a more significant role with his children. While Taitano has opened his home to the children as a stepfather, at the time of the hearing he had been married to Primitiva for a little less than one year.

Olopai's rights to continue his parent and child relationship cannot be terminated without a finding that he is unfit. If the lower court grants the adoption solely upon a finding that a substitution of the stepfather for the natural father is in the best interests of the children, it will deny Olopai the due process he is guaranteed by the Fourteenth Amendment.

---

[2] These calculations are based upon the age of the children on the date of the hearing in the lower court.

## TERMINATING PARENTAL RIGHTS UNDER CNMI STATUTES.

**A.** **The CNMI Has No Statute Establishing the Criteria For, Or Even Authorizing, the Termination of Parental Rights.**

Subdivision (a) of 8 CMC § 1725 (entitled "Proceeding to Terminate Parental Rights") provides:

> If a mother relinquishes or proposes to relinquish for adoption a child . . ., or if a child <u>otherwise becomes a subject of an adoption proceeding</u> . . . the mother or the person having custody of the child, shall file a petition in the Commonwealth Trial Court to <u>terminate the parental rights of the father</u>. . . . (Emphasis added.)

Thus, it is recognized expressly by Commonwealth statute that there must be a termination proceeding in advance of an adoption proceeding if the father's rights are to be terminated.

As the majority notes, the problem is that there is no Commonwealth statute permitting termination of parental rights when the parent is known. More specifically, what is missing is a statute setting forth the criteria for finding a parent unfit. The fact that a statute calling for termination of parental rights exists without an implementing statute is due to the fact that the legislature adopted the Uniform Parentage Act for the purpose of establishing paternity. The Uniform Parentage Act assumes that a statute dealing with termination of parental rights has already been enacted. Unfortunately, no such legislation has ever been enacted in the Commonwealth. Typically, such a termination statute specifies abandonment, cruel treatment, neglect, habitual use of

alcohol or controlled substance, moral depravity, conviction of certain felonies, developmental disability, or mental illness as grounds for termination of parental rights.[3]

B. **The Criteria of "Best Interests of the Child" Does Not Meet the Standard of "Unfitness," Is Not Authorized By Statute, And Does Not Protect Society's Interest in Maintaining Natural Relationships.**

Upon remand of the case, the lower court will be faced with a dilemma. 8 CMC § 1725(a) requires a termination proceeding since the father is known. Due process requires that the father's rights cannot be terminated without a finding of unfitness. Stanley, supra; Smith, supra; Quilloin, supra. But there is no statute establishing a procedure for the termination of parental rights or the criteria for determining unfitness.

The majority provides guidance over this hurdle for the lower court; and, it is here that I take exception to the opinion. To understand why, it is best to summarize the majority's solution. After recognizing that there is no Commonwealth statute for the termination of parental rights, the majority takes the general principle for the granting of adoptions -- the "best interests of the child" -- from 8 CMC § 1403 and "extends" it to termination proceedings. There is no indication that the legislature ever intended such a standard to apply to the termination of parent-

---

[3] There is no proposed uniform law on the termination of parental rights. However, an example of such legislation in one jurisdiction can be found at Cal. Civil Code § 232.

116

child relationships. The majority only states that they can find no reason why they "cannot, or should not" extend the statute.

In my opinion, they cannot extend the "best interests of the child" criteria to termination proceedings because it will violate Olopai's Fourteenth Amendment due process rights. The disagreement in this case is not over whether Olopai possesses a parent-child relationship. The majority does not treat him as a Quilloin father. As in Stanley, they recognize that he has a parent-child relationship that is "natural and fundamental." They require a higher burden of proof, clear and convincing evidence, to terminate the relationship, citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Santosky requires the higher burden of proof only in termination proceedings that involve constitutionally-protected parent-child relationship. Therefore, the majority recognizes this as a Stanley relationship; but, they fail to afford the protection of Stanley by requiring a showing of unfitness in termination proceedings.

In addition, they should not extend the adoption criteria to termination proceedings. 8 CMC § 1403, which announces the standard of "best interests of the child", expressly applies to adoptions only. To extend this criteria to a new area, such as termination proceedings, is judicial legislation. Courts should only construe statutes, not legislate.

In conclusion, I disagree with the majority on two grounds: (1) they have announced criteria for the termination of parent-child relationships that does not amount to a finding of unfitness,

117

which is contrary to the Due Process Clause, and (2) the criteria announced is without statutory basis and is the product of the court's own legislation.

I not only feel compelled to dissent on the basis of precedent, but I believe that the standard adopted can lead to great harm. "Best interests of the child" contains both negative and positive criteria. The negative criteria suggested by the majority, such as abandonment, neglect, cruelty, drug use, and alcoholism, fall within the definition of unfitness. The positive criteria suggested, such as the ability of the adoptive parent to provide proper love, care, attention, and guidance to the child, do not fall within the definition of unfitness. Without a requirement that a court first make a finding as to the presence of the negative criteria (unfitness), a decision could be made primarily, or solely, based upon the positive criteria. In other words, the parent-child relationship of an unwed father could be entirely terminated solely because a third person (such as a stepfather) may be able to provide better health care, schooling, or other economic advantages. No court should be allowed to play a divine role in choosing the "best" father for a child when there is no need to interfere in the natural relationship.

## C. The Search For Some Statutory Criteria For Unfitness.

The frustration of the majority in remanding a case for termination proceedings when no termination criteria exists is quite understandable. If I were to search for such criteria, I

118

believe it could be found in 8 CMC § 1402:

> No adoption may be granted without either the written consent of, or notice to, each of the known living legal parents who has not been adjudged insane or incompetent or has abandoned the child for a period of six months . . . .

The statute recognizes three categories of adoption proceedings: (1) those where the natural parents consent, (2) those where the natural parents do not consent, so they receive notice, and (3) those where the natural parents have been adjudged insane, incompetent, or have abandoned the child for a period of six months. While I do not contend that this statute was intended to act as a termination statute, it does not recognize the rights of a parent who has abandoned a child for six months or who has been found insane or incompetent. These are circumstances that would render a parent unfit, so they are constitutionally permissible as criteria for terminating the parent-child relationship.

If Olopai exercises his veto rights over the adoption and there is no statute specifying criteria for the termination of parental rights, the trial court may proceed with the adoption hearing if it first decided that Olopai has abandoned the children for a period of six months.[4] This standard would comport with the due process requirement of a finding of unfitness. If there is no clear and convincing evidence of such abandonment, then, without either Olopai's consent or the enactment of legislation

---

[4] I assume that there are no grounds for finding Olopai insane or incompetent.

establishing criteria for terminating parental rights, the adoption may not proceed.

Because I agree with the majority's conclusion that the petitioner has not established by clear and convincing evidence that Olopai abandoned his sons up to the time of the hearing, I believe that his parental rights must be respected and that the children cannot be adopted without his consent at this time.

## V.

## CONCLUSION

The issue raised by this appeal is of great importance. The most fundamental institution in any society is the family. It has existed longer than government and the success of any government depends upon the success of the family. This case has required the balancing of weighty interests, those of the parents and those of the children. While I respect the decision of the majority to give primacy to the interests of the child, I cannot accept that a father's natural right to continue a parental relationship with his child can be terminated without any showing of wrongdoing on the part of the father.

Government should not disturb such a fundamental relationship without good cause arising to the level of unfitness of the father. To hold otherwise would subject any unwed father to the loss of his rights to act as the natural father of his child, regardless of his conduct, simply because a court perceives that some third person would be a "better" father. The Due Process Clause of the

120

Fourteenth Amendment prevents this from occurring. The majority has failed to invoke its protection in the Commonwealth.

Of course, there are times when a father is unfit to raise a child. I hope that the Commonwealth legislature enacts legislation expressly setting forth the criteria for a finding of unfitness so that parent-child relationships can be terminated when necessary to protect the child. On the basis of the evidence before the Court, such protection is not necessary in this case.

REXFORD C. KOSACK, Special Judge